**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>STEWARD HEALTH CARE SYSTEM LLC, *et al.*,[1]<br>　　　　　Debtors. | Chapter 11<br><br>Case No. 24-90213 (CML)<br><br>(Jointly Administered) |
| CATHOLIC HEALTH INITIATIVES COLORADO, COMMONSPIRIT HEALTH AND COMMONSPIRIT MOUNTAIN REGION f/k/a CENTURA HEALTH CORPORATION,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>STEWARD HEALTH CARE SYSTEM, LLC; DAVIS HOSPITAL & MEDICAL CENTER, LP; IASIS HEALTHCARE LLC; JORDAN VALLEY MEDICAL CENTER, LP; PHYSICIAN GROUP OF UTAH, INC.; SALT LAKE REGIONAL MEDICAL CENTER, LP; SALT LAKE REGIONAL PHYSICIANS, INC.; SEABOARD DEVELOPMENT LLC; SOUTHRIDGE PLAZA HOLDINGS, INC.; AND STEWARD MEDICAL GROUP, INC.,<br><br>　　　　　Defendants. | Adversary Case No. 24-_____ |

**COMPLAINT FOR BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTIES, UNJUST**

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/Steward. The Debtors' service address for these chapter 11 cases is 1900 N. Pearl Street, Suite 2400, Dallas, TX 75201.

**ENRICHMENT, CONVERSION FRAUD, DECLARATORY JUDGMENT, AND INJUNCTIVE, SPECIFIC PERFORMANCE AND OTHER EQUITABLE RELIEF, INCLUDING ACCOUNTING AND CONSTRUCTIVE AND/OR RESULTING TRUSTS**

Plaintiffs Catholic Health Initiatives Colorado ("**CHIC**"), CommonSpirit Health ("**CommonSpirit**") and CommonSpirit Mountain Region f/k/a/ Centura Health Corporation ("**CSMR**") and collectively with CHIC and CommonSpirit (the "**Plaintiffs**") hereby bring this Complaint for Breach of Contract, Breach of Implied Covenant of Good Faith and Fair Dealing, Breach of Fiduciary Duties, Unjust Enrichment, Conversion, Fraud, Declaratory Judgment, and Specific Performance, Injunctive and Other Equitable Relief, including Constructive and/or Resulting Trusts against Defendants ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████ (collectively and with Steward, the "**Sellers**" or "**Defendants**"), and allege as follows upon their own knowledge and upon information and belief as to all other matters:

## NATURE OF THE ACTION

1.      In February 2023, Plaintiff CHIC and Defendants entered into an asset sale agreement and related ancillary agreements (collectively, the "**APA**"), for the purchase and sale of five hospitals along with numerous other affiliated healthcare facilities owned by the Sellers and located in Utah ("**Utah Sale**").[2]

2.      Plaintiff CommonSpirit is the Buyer Guarantor under the APA.

---

[2] The five hospitals are: ████████████████████████████████████████
██████████████████████████████████████████████████████████
(collectively, the "**Utah Hospitals**").

3.      The Utah Sale closed on May 1, 2023 ("**Utah Sale Closing Date**"). Under the APA, and in accordance with state and federal laws, ██████████████████████████ ████████████████████████████████████████████████ ███████████████████████████████████████ (the "**Reimbursements**"). Additionally, under the APA, Defendants agreed to ███████████ ██████████████████████ (as defined in the APA).

4.      All of the Reimbursements are for patient services provided by Plaintiffs and their employees and are CHIC's property, and the Defendants have no interest (tangible, intangible or colorable) in the Reimbursements.

5.      Unremitted Reimbursements in the amount of at least $16,836,922.05 (the "**Outstanding Reimbursements**") were received by Defendants, ██████████████████ ████████████████████████████████████████████████ ██████████████████████.

6.      Plaintiff CSMR and CommonSpirit are affiliates of CHIC.

7.      In connection with the Utah Sale and as a material inducement for Plaintiffs to enter into the APA, Steward (together with its affiliates and subsidiaries), as Vendor, and CSMR (together with its affiliates), as Authorized User, entered into a Transition Services Agreement (the "**TSA**"), pursuant to which Defendants agreed to ███████████████████████████ ████████████████████████████████████████████████ █████████████████████████████.

8.      Following the Utah Sale Closing Date, the Defendants did not transfer all Books and Records to Plaintiffs, and, as of the date hereof, the Defendants have not transferred such Books and Records despite repeated requests by Plaintiffs.

9.      Following the Utah Sale Closing Date, the Defendants initially performed their duties and obligations under the APA and the TSA by ████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████.

10.      In February 2024, after Defendants acknowledged that the Reimbursements were received by Defendants and were the sole property of Plaintiffs, Defendants and Plaintiffs agreed that the Defendants would make (i) daily wire transfers to Plaintiffs to stay current with incoming Reimbursements received and (ii) bi-monthly installment payments in the amount of $750,000.00 (the "**Installment Payments**") until the full amount of the outstanding and delinquent Reimbursements had been transferred to Plaintiffs.

11.      The Defendants honored their agreement and continued to perform until May 3, 2024, when Defendants failed to remit the $750,000.00 Installment Payment due to Plaintiffs.

12.      On May 6, 2024 (the "**Petition Date**"), Steward and 166 of its affiliated debtors (collectively, the "**Debtors**") including each of the Defendants herein, each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

13.      The Defendants continue to be in possession of their properties and are operating and managing their businesses as a debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

14.      Since the Petition Date, the Defendants have paid no Installment Payments to Plaintiffs.

15.     As of the Petition Date, Defendants owe Plaintiffs no less than $16,836,922.05 in Outstanding Reimbursements that Defendants collected for Plaintiffs.

16.     Plaintiffs are the sole and exclusive provider of the patient services that are the basis for the Outstanding Reimbursements and are the sole owners of the Outstanding Reimbursements, and Defendants have no ownership interest in the Outstanding Reimbursements, which are not property of the Defendants' bankruptcy estates.

17.     Defendants know and, in discussions and negotiations leading up to the agreed-to Payment Plan (as defined below), have admitted they wrongfully retained Plaintiffs' Reimbursements, which includes the Outstanding Reimbursements.

18.     Defendants also know and have specifically agreed, pursuant to the APA, ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

19.     Plaintiffs bring this action to enforce contracts between Plaintiffs and Defendants (the "**Parties**") and obtain the relief to which Defendants have already agreed Plaintiffs are entitled to seek pursuant to ███████████████████████████████████████████████████

███████████████████.

## PARTIES

20.     Plaintiff Catholic Health Initiatives Colorado is a nonprofit corporation organized under Colorado law with a principal place of business in Centennial, Colorado.

21.     Plaintiff CommonSpirit Health is a nonprofit corporation organized under Colorado law with a principal place of business in Centennial, Colorado.

22.     Plaintiff CommonSpirit Mountain Region f/k/a Centura Health Corporation is a nonprofit corporation organized under Colorado law with a principal place of business in Centennial, Colorado. CSMR's sole member is CHIC, and its primary purpose is to provide a financially and operationally integrated organization for the common management and operation of health care facilities that CHIC owns.

23.     Defendant ████████████████████████████ ████████████████████████████████████████████ ████████████████████████.

24.     Defendant ████████████████████████████ ████████████████████████████████████████████ ███████.

25.     Defendant ████████████████████████████ ████████████████████████████████████████████ ███████.

26.     Defendant ████████████████████████████ ████████████████████████████████████████████ ███████.

27.     Defendant ████████████████████████████ ███████████████████████████████████████.

28.     Defendant ████████████████████████████ ████████████████████████████████████████████ ████████████████.

29.    Defendant ███████████████████████████████████
████████████████████████████████████████████████████████
████ .

30.    Defendant ███████████████████████████████████
████████████████████████████████████████████████████████
████ .

31.    Defendant ███████████████████████████████████
████████████████████████████████████████████████████████
████ .

32.    Defendant ███████████████████████████████████
████████████████████████████████████████████████████████
████████ .

## JURISDICTION AND VENUE

33.    This Court has jurisdiction over this complaint under 28 U.S.C. § 1334(b) in that this is a civil proceeding related to the Defendants' underlying jointly administered cases arising under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").

34.    This adversary proceeding constitutes a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (B) and (O). In the event that this or any other appropriate Court finds any part of this adversary proceeding to be "non-core," Plaintiffs consent to the entry of final orders and judgments by this Court pursuant to Rule 7008 of the Bankruptcy Rules and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas.

35.    Venue is proper under 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under and in connection with a bankruptcy case pending in this district.

36.     This adversary proceeding is initiated under Bankruptcy Rules 7001(1), (2), (7) and

(9), and 28 U.S.C. § 2201.

## FACTS

**A.     CHIC bought the Facilities under the Asset Purchase Agreement, which entitles CHIC** .

37.     On February 15, 2023, certain Parties, not including CSMR, entered into the APA.

A true and correct copy of the APA is attached as **Exhibit A**. The transactions set forth in the APA

were consummated on the Utah Sale Closing Date.

38.     Under the APA, Defendant Sellers sold to Plaintiff CHIC substantially all of the

assets used in or held for use in the Utah Hospitals and other healthcare facilities owned, leased,

managed or operated by any Seller or Seller affiliate in the state of Utah (together, the "**Facilities**").

*See generally* APA § 2.

39.     The APA identifies ███████████████████████

███████" *See id.* at 1.

40.     APA § 2.1 identifies the ████████████████████

███████████████████████████████████████

██████████.

41.     Pursuant to APA § 2.1(f), Plaintiff CHIC ████████████████

███████████████████████████████████████

███████████████████████████████.[3]



---

[3] The APA defines ███████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████

42.     Pursuant to APA § 7.2(a), Defendant Sellers agreed to ████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████

43.     Pursuant to APA § 7.2(b), ██████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████.

44.     APA § 3.1 provides that the ████████████████████████████████ █████████████████████████████████████████ (the "**Effective Time**").

45.     On the Utah Sale Closing Date, Plaintiffs and Defendants entered into that certain Letter Agreement to the Asset Purchase Agreement ("**Letter Agreement**") ████████████ ████████████████████████. A true and correct copy of the Letter Agreement is attached as **Exhibit B**.

46.     In the usual context of the sale of hospital and related health care facility assets, such as the sale of the Facilities involved here, due to the complexities involved with billing and collecting under governmental and private payor programs, seller parties often agree to act as billing and collection agents, receiving and transferring certain funds received in such capacities on behalf of the other, buyer party after transactions have closed.

47.     For example, the sale of hospital assets, as described in the APA, gives rise to a ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

████████████████████████████████████████████████████████████ ████████████████████████████████████████████.

███████████████████████████████████.″[4] When the buyer accepts assignment of the seller's Medicare Part A provider agreement, the benefit is that, upon the agreement of the buyer and seller, the buyer can use the seller's Medicare billing information to submit Medicare claims with service dates as of the change of ownership effective date as indicated in the Medicare Form 855A change of ownership ("**CHOW**") application submitted by buyer to the Centers for Medicare and Medicaid Services ("**CMS**").[5] CMS, however, relies solely upon the seller's billing information on file to reimburse claims submitted for buyer's  services until buyer's CHOW application has been approved and CMS issues the "tie-in"/approval notice. Specifically, although the Medicare rules generally prohibit billing under another entity's Medicare billing information, when the buyer accepts the seller's Medicare Part A provider agreement, CMS allows the parties to enter into a voluntary arrangement (typically through a short term license or other agreement) as part of such a transition whereby a buyer of one or more Part A Medicare provider(s), in this instance, the Plaintiffs, can bill for services provided by the buyer using the seller's Medicare billing information until the buyer's CHOW application is approved (evidenced by CMS issuing the "tie-in"/approval notice) and the transfer of the seller's Medicare provider number and provider agreement to the buyer is effectuated.[6] Under those circumstances, and pursuant to the arrangement agreed to between the parties, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[4] *See* 42 C.F.R. 489.18(c).

[5] If the buyer instead rejects assignment of the seller's Medicare Part A provider agreement, the buyer must file an initial application to participate in the Medicare program, and will forego any Medicare reimbursement for services provided during the lengthy application review by CMS.

[6] *See* Medicare Program Integrity Manual Ch. 10, Section 10.6.1.1.4 & Section 10.6.22.

██████████████████████████████████████████████████████

("**Billing Agreement**").[7]

████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████."

    49.    Pursuant to the APA at § 7.4, the Parties further specifically agreed ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████.[8]



---

[7] Pursuant to APA § 7.8, i██████████████████████████████████
██████████████.

[8] ████████████████████████████:
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████.

**B.**     **Defendants breached their agreement to** ███████████████████
███████████████████████████.

50.     Following the Effective Time, Defendants failed to █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.

51.     As set forth in correspondence, dated January 26, 2024, following the Effective

Time, Centura (on behalf of itself and CHIC), repeatedly requested that the Defendants comply

with their respective covenants under the APA and the TSA, including w███████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Attached hereto as **Exhibit Group C** are true

and correct copies of correspondence, dated January 26, 2024 and September 27, 2024, wherein

Plaintiffs requested and/or demanded ███████████████████████████████████

████████████████████████████████████.

52.     As of the date hereof, Plaintiffs have not received ███████████████████

███████.

**C.**     **Defendants agreed to** ███████████████████████████████████
██████████████████████████████████████████████.

53.     To facilitate the purchase and sale of the Purchased Assets and the Facilities'

continued operations after the sale, the Parties entered into a series of "**Transaction Documents.**"

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████.

54.     Among the Transaction Documents is a Transition Services Agreement (the

"**TSA**"). *See id.* at § 3.2(g). A true and correct copy of the TSA is attached hereto as **Exhibit D**.

55.     Defendants entered into the TSA with Plaintiffs. *See* TSA at p.1.[9]

56.     Plaintiffs entered into the TSA with Defendants ████████████████████

████████████████████████████████████. *Id.* at p.1,

Recital C.

57.     Under the TSA, Defendants agreed to ████████████████████

████████████████████████████████████

████████████████████. *Id.* at § 1.1.

58.     ████████████████████████████████████

████████████████████████████████████

████████████.

59.     Defendants  agreed  to ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████.

60.     Specifically, Defendants agreed to:

████████████████████████████████

████████████████████████████████

████████████

*Id.* at 42 (row RCM.049).

**D.     Defendant** ████████████████████████████

████████████████████████████

[9] Steward and its affiliates and subsidiaries, as the Vendor, entered into the TSA with CSMR and its affiliates, as the Authorized User.



61.    Under APA § 7.9(a), Steward "███████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████

62.    ███████ agreed that its ███████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████.

63.    ███████ also "██████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████ *Id.*

64.    Under APA § 10.9(a), ████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████

65.    Accordingly, ██████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

██████████

66.    ███████ also agreed not to █████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

67.    The APA includes ███████████████████████████████

████████████████████████████████████████████████

█████████████████████████.[10]

68.    Under APA § 13.2, ████████ ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████,"

69.    Under APA § 13.8, the Parties also █████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

**E.      After performing their reconciliation and funding transfer obligations between the Effective Time and September 2023, Defendants breached**



70.    After entering into the APA, the TSA, and the other Transaction Documents, the Parties began performing their obligations under such Contracts.

---

[10] This action seeks specific performance and other equitable and injunctive relief, which is outside the dispute resolution process, as permitted by the APA. Thus, CHIC hereby expressly reserves any and all other remedies, claims, and causes of action not specifically addressed herein, whether those remedies, claims, or causes of action are related or unrelated to the breaches or conduct described. Although not required to do so, Plaintiffs did contact Defendants prior to commencing this action and attempted to confer on claims asserted herein.

71.     Following the Effective Time, the Parties worked together to develop a process surrounding ███████ timely provision of the required Reconciliation Statements and transfer of Reimbursements it received on CHIC's behalf for patient services rendered by CHIC.

72.     In particular, the Parties entered into a "Payment Reconciliation and Transfer Process Agreement" (the "**Payment Process Agreement**"). A true and correct copy of the Payment Process Agreement is attached as **Exhibit E**.

73.     Pursuant to the Payment Process Agreement, the Parties agreed to the following "Requirements" to be timely provided by Steward to Plaintiffs:

> 1)     Weekly spreadsheet with relevant totals and wire dates; and
>
> 2)     Account level detail supporting the transfer amounts.

74.     Pursuant to the Payment Process Agreement, the Parties further agreed to specific means for achieving the Requirements, which included, in relevant part, the following:

> 1)     Every Monday, beginning 5/15/23, Steward provides a detailed file of all payments received for dates of service after 5/1 during the previous week (Monday to Sunday);
>
> 2)     A wire transfer will be sent by close of business on Tuesday, beginning 5/16/23, representing the prior week's CSMR cash postings; and
>
> 3)     The wire transfer will align to the amount on the updated spreadsheet.

75.     Beginning on May 15, 2023, Defendants sent CSMR a Reconciliation Statement every week identifying the amount of funds it received on CHIC's behalf for patient services rendered by CHIC and that were owed to CHIC for providing patient services (i.e., the Reimbursements).

76.     The initial May 15, 2023 Reconciliation Statement reflected that Defendants had collected $385,707.14 in Reimbursements between May 1, 2023 and May 14, 2023, which Defendants had not remitted to CHIC.

77.     On May 22, 2023, ███████ remitted $385,707.14 to CHIC—the same amount shown on Defendants' May 15, 2023 Reconciliation Statement. A true and correct copy of the May 15, 2023 Reconciliation Statement is attached as **Exhibit F**.

78.     From May 15, 2023 until September 2023, Defendants provided similar Reconciliation Statements to CHIC to account for Reimbursements that Defendants had collected on behalf of Plaintiffs.

79.     Within three to eight days after sending each Reconciliation Statement to CHIC, Defendants transferred Reimbursements to CHIC in the amount shown in the most recent Reconciliation Statement.

80.     Beginning in early September 2023, Defendants █████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████. A chart summarizing the reconciliations and related remittances received from Defendants as of the filing of this Complaint, is attached hereto as **Exhibit G.**

81.     On September 18, 2023, CSMR's Senior Vice President & Chief Transformation Officer, Scott Lichtenberger, emailed Steward's Executive Vice President, M&A/Capital Markets, Jeff Morales, ("**CSMR September 18, 2023 Email**") identifying three missing Reimbursements that Defendants had failed to transfer to Plaintiffs totaling approximately $28.6 million. A copy of the CSMR September 18, 2023 Email is attached as **Exhibit H**.

82.     Mr. Morales responded the same day ("**Steward September 18, 2023 Email**"), promising that Defendants "will process [the missing Reimbursements] shortly." A copy of the Steward September 18, 2023 Email is attached as **Exhibit I**.

83.     On September 19, 2023, Mr. Lichtenberger again emailed Steward ("**CSMR September 19, 2023 Email**") to notify them that CHIC had received one of the missing Reimbursements but that two additional Reimbursements had not yet been remitted by Defendants to Plaintiffs. A copy of the CSMR September 19, 2023 Email is attached as **Exhibit J**.

84.     Steward did not respond to the CSMR September 19, 2023 Email; Mr. Lichtenberger sent additional emails to Defendants on September 20, 2023 and September 21, 2023 (collectively, the "**CSMR Follow-Up Emails**") inquiring about the missing Reimbursements. Copies of the CSMR Follow-Up Emails are attached as **Exhibit K.**

85.     Defendants responded on September 21, 2023 ("**Steward September 21, 2023 Email**"), promising to "check on this now and get back to you." A copy of the Steward September 21, 2023 Email is attached as **Exhibit L**.

86.     On September 25, 2023 ("**CSMR September 25, 2023 Email**"), having received no further response from Defendants, Mr. Lichtenberger sent another email asking about the missing Reimbursements. A copy of the CSMR September 25, 2023 Email is attached as **Exhibit M**.

87.     Later that day, Mr. Morales on behalf of Defendants responded ("**Steward September 25, 2023 Email**"), asserting that ███████ had ████████████████████ and asking, "Are you sure that we are behind?" A copy of the Steward September 25, 2023 Email is attached as **Exhibit N**.

88.     The next day, September 26, 2023, CHIC's Treasurer, Andrew Gaasch, responded to Defendants ("**CHIC September 26, 2023 Email**") with complete remittance records showing that, through late August 2023, Steward provided reconciliation calculations, remitted the required Reimbursements and noting that Steward was then "at 30+ days behind on a significant wire from end of August." A true and correct copy of the CHIC September 26, 2023 Email, including all emails set forth in Exhibits H -N, is attached as **Exhibit O.**

89.     Attached to the CHIC September 26, 2023 Email was the Payment Process Agreement by which ████████████████████████████████████████ ████████████████████████████████████.

90.     Defendants did not respond in writing to the CHIC September 26, 2023 Email. On September 27, 2023, during a telephone conversation between Mr. Gaasch and Mr. Morales, Mr. Morales admitted ████████████████████████████████████.

91.     Despite this admission, Defendants made no further remittances of Plaintiffs' Reimbursements to Plaintiffs. Moreover, Steward failed to respond in any manner to numerous additional follow-up communications from CHIC on October 2, 2023, October 5, 2023, and October 6, 2023, respectively.

92.     By October, 2023, Defendants also stopped sending any Reconciliation Statements.

93.     Plaintiffs did not receive any Reimbursements from Defendants from August 25, 2023 through September 18, 2023.

94.     On October 9, 2023, CHIC informed Defendants' counsel that CHIC would be forced to take action to enforce its remedies ████████████████████████████████ ████████████████████████████████████████ ████████████████████ (the "**October 9 Email**"). A true and correct copy of the October 9 Email

96106287v14

19

is attached hereto as **Exhibit P**. In response, Defendants recommitted to making the required transfers and conveyed their intent to do so in a voicemail to CHIC's counsel on October 9 (the "**October 9 Voicemail**"). A true and correct transcript of the October 9 Voicemail is attached hereto as **Exhibit Q.**

95.     Between September 18, 2023 and January 5, 2024, Defendants made some additional payments, ███████████████████████████████████████████████████████████ ████████████████████████████.

96.     On December 5, 2023 (the "**Steward December 5, 2023 Email**"), Mark Rich, President of Steward, told CHIC: "I do not think I can get you all this week.  I am pretty sure I can get 1 paid, each over the next 3 weeks."  Mr. Rich then described a series of financial operations and cash flow issues that Steward was experiencing, and closed his email stating "All that is just to say I am a little tight right now, but I will get you a payment this week and next." A true and correct copy of the Steward December 5, 2023 Email is attached as **Exhibit R.**

97.     Mr. Rich did not respond to multiple emails sent by CHIC on December 8, 2023, December 12, 2023, December 14, 2023, and December 18, 2023 (collectively, the CHIC "**December Follow-Up Emails**"), respectively.  True and correct copies of the December Follow-Up Emails are attached as **Exhibit S**.

98.     Defendants also failed to provide Reconciliation Statements to confirm the amounts Defendants had collected for Plaintiffs but had not remitted to Plaintiffs during December 2023 and January 2024.

99.     On February 1, 2024, CHIC, through its counsel, again advised Defendants and their counsel that CHIC would be forced to immediately exercise its enforcement remedies ████ ███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████ (the "**February 1 Email**").

100.    In response, on February 8, 2024, Defendants committed to a specific plan to address the outstanding transfers due and recommitted to make daily transfers to Plaintiffs (the "**Payment Plan**").

101.    The Payment Plan provided that Defendants would (i) immediately pay Plaintiffs $2 million, (i) make daily cash payments by wire transfer to Plaintiffs to stay current with incoming collections and associated Reimbursements, and (iii) pay $750,000 every other week on account of the approximately $21 million of Outstanding Reimbursements until paid in full.

102.    Defendants performed under the Payment Plan between February 13, 2024 and May 3, 2024, when Defendants again abruptly stopped making the Reimbursements, without providing any justification or explanation to Plaintiffs.

103.    Defendants did not make the $750,000 payment due on May 3, 2024.

104.    Defendants have paid no post-petition Outstanding Reimbursements due CHIC on or after May 10, 2024 through the present.

105.    As of the date of this Complaint, without justification, Defendants have received and failed to remit to Plaintiffs no less than $16,836,922.05 of Outstanding Reimbursements, which constitutes Plaintiffs' property.

106.    Upon information and belief, CHIC estimates that Defendants receive approximately $73,000 daily in Reimbursements for patient services provided by Plaintiffs and their employees.

96106287v14

107.    Defendants have admitted that ███████████████████████████

████████████████████████████████████████████████████████████

███████████████████████

108.    Defendants' continued failure to pay the Outstanding Reimbursements has deprived Plaintiff of significant funds and has resulted in and continues to result in serious disruptions and injury to Plaintiffs' business operations.

109.    Prior to filing this Complaint, Plaintiffs demanded that Defendants return the Outstanding Reimbursements, and Defendants have refused to return any portion thereof and further demanded that Plaintiffs cease and desist from asserting their rights with respect to the Outstanding Reimbursements.

**COUNT I – BREACH OF CONTRACT**
**(SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF, INCLUDING ACCOUNTING AND CONSTRUCTIVE AND/OR RESULTING TRUST)**

**[Against All Defendants]**

110.    Plaintiffs incorporate all preceding allegations as if set forth fully herein.

111.    The APA, TSA, Letter Agreement and other Transaction Documents (collectively, the "**Contracts**") constitute contracts between Defendants and Plaintiffs.

112.    The Contracts are valid and enforceable, ██████████████████████

████████████████████████████████.

113.    The APA's choice of law provision ████████████████████████

████████████████████████████.

114.    Plaintiffs have performed and continue to be ready, willing, and able to perform under the terms of the Contracts.

115.     Defendants breached and remain in breach of their obligations under the Contracts by, *inter alia*, failing to ███████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████

116.     Specifically, ████████ has breached and remains in breach of its obligations under

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████

117.     Defendants have also breached and remain in breach of their obligations under APA

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████

118.     As a result of Defendants' breaches, Plaintiffs have been deprived of ████████████

████████  and Plaintiffs have been deprived of no less than $16,836,922.05 in Outstanding Reimbursements, plus attorneys' fees and costs and disruption to Plaintiffs' business, and will continue to incur significant additional losses each week that Defendants continue to fail to provide the contractually required Reconciliation Statements and make the contractually required Reimbursements Defendants received and continue to receive on behalf of Plaintiffs.

119.     Defendants' failure to timely pay the Reimbursements they have received on behalf of Plaintiffs constitutes irreparable harm for which there is no adequate remedy at law, entitling Plaintiffs to ████████████████████████████████████████████████████████████████.

120.     In addition, the balance of the equities favors an order of specific performance and/or the imposition of a constructive and/or resulting trust in favor of Plaintiffs.

**COUNT II – BREACH OF IMPLIED COVENANT**
**OF GOOD FAITH & FAIR DEALING**
**(SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, AND OTHER EQUITABLE**
**RELIEF, INCLUDING ACCOUNTING AND CONSTRUCTIVE AND/OR RESULTING**
**TRUST)**

121.    Plaintiffs incorporate all preceding allegations as if set forth fully herein.

122.    It was a fundamental expectation of the Parties that Defendants would remit to Plaintiffs all Reimbursements collected on behalf of Plaintiffs, and such expectation was material to the agreement reached among the Parties.

123.    

124.    It was (and remains) an implied covenant under the APA that

125.    Equitable relief,                                                          is available through, *inter alia*, imposition and establishment of a constructive, resulting and/or other trust.

126.    To the extent that Defendants have not held Plaintiffs' unremitted Reimbursements, including Outstanding Reimbursements, in trust and/or escrow for Plaintiffs, Defendants have breached their implied covenant of good faith and fair dealing.

127.    Upon information and belief, Defendants used all or some of the Reimbursements, including the Outstanding Reimbursements, to fund operations and/or administrative costs of the Debtors' businesses and/or the Chapter 11 Cases.

128.    Defendants' actions and inactions, through wrongfully withholding and usurping and/or expending Plaintiffs' Reimbursements, denied Plaintiffs the benefit of the Parties' bargain and caused injury to Plaintiffs in an amount of no less than approximately $16,836,922.05.

129.     The implied obligation and duty to hold Plaintiffs' Reimbursements in trust will protect the spirit of the Contracts, without being inconsistent with or overriding the express terms of the Contracts.

130.     Plaintiffs have suffered damages as a result of Defendants' breach of the implied covenant of good faith and fair dealing owed to Plaintiffs, including monetary damages in an amount no less than $16,836,922.05 of Outstanding Reimbursements that Defendants failed to remit to Plaintiffs, plus attorneys' fees and costs and disruption to Plaintiffs' business

### COUNT III – BREACH OF FIDUCIARY DUTIES
### (SPECIFIC PERFORMANCE, INJUNCTIVE RELIEF, AND OTHER EQUITABLE RELIEF, INCLUDING ACCOUNTING AND CONSTRUCTIVE AND/OR RESULTING TRUST)

### [Against All Defendants]

131.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.



132.     Plaintiffs entrusted Defendants with ███████████████████ ████████████████████████ whereby Defendants would have the power to exercise control over Plaintiffs' property, including the Reimbursements, and treat such property as if it was Defendants own property.

133.     Plaintiffs relied on this relationship of special trust and confidence with Defendants.

134.     Plaintiffs' and Defendants' interests with respect to ██████████ ███████████

135.     As a result of the nature of the Utah Sale, ███████████ ██████████████████████ Plaintiffs were completely dependent on the Defendants to collect healthcare receivables earned by Plaintiffs.

136.     Defendants exercised complete control over Plaintiffs' property, including Plaintiffs' healthcare receivables, and, through such exercise of control, dealt with the Plaintiffs'

property, including the Outstanding Reimbursements, in a manner that unfairly benefited Defendants.

137.    Additionally, under the TSA, ███████████████████████████████████ ███████████████████████████████████.

138.    Pursuant to Section V(a) of Schedule 1.1(c) to the TSA, ████████████ ███████████████████████████████████████████████████ ████████████████████████████



139.    As their agent and the recipient of Plaintiffs' healthcare receivables, Defendants owe to Plaintiffs fiduciary duties, including, without limitation, the duties of care, loyalty, and good faith, as well as the duty to safeguard Plaintiffs' receivables for healthcare services provided by Plaintiffs and/or Plaintiffs' employees.

140.    Defendants breached their fiduciary duties to Plaintiffs by failing to safeguard and remit no less than $16,836,922.05 in Outstanding Reimbursements to Plaintiffs.

141.    Defendants also breached their fiduciary duties to Plaintiff by failing to disclose material information, including the Reconciliation Statements, concerning the Outstanding Reimbursements, including with respect to Defendants intentions to fail to release Plaintiffs' Outstanding Reimbursements to Plaintiffs.[11] As a result, Plaintiffs cannot ascertain the precise

---

[11] Defendants have exclusive knowledge of the exact amount of Reimbursements, including Outstanding Reimbursements, received on behalf of, but not remitted to, Plaintiffs. Prior to the filing of this Complaint, Plaintiffs

amount of Outstanding Reimbursements, which Plaintiffs believe to be no less than $16,836,922.05.

142.    Upon information and belief, Defendants breached their fiduciary duties to Plaintiffs by usurping the outstanding Reimbursements to assist with Defendants' liquidity issues by funding Defendants' ongoing business operations and/or administration of the Defendants' Chapter 11 Cases.

143.    Plaintiffs have suffered damages as a result of Defendants' breach of their fiduciary duties to Plaintiffs, including deprivation of Purchased Assets, including ███████████, and monetary damages in an amount no less than $16,836,922.05 of Outstanding Reimbursements that Defendants failed to remit to Plaintiffs, plus attorneys' fees and costs and disruption to Plaintiffs' business.

### COUNT IV – UNJUST ENRICHMENT
### (INJUNCTIVE RELIEF AND/OR OTHER EQUITABLE RELIEF, INCLUDING ACCOUNTING AND CONSTRUCTIVE AND/OR RESULTING TRUST)

### [Against All Defendants]

144.    Plaintiffs incorporate all preceding allegations as if set forth fully herein.

145.    Plaintiffs have determined the amount of Outstanding Reimbursements, based on all information available to Plaintiffs, and Plaintiffs have notified Defendants of such amount, as well as the Defendants' obligation to remit the Outstanding Reimbursements to Plaintiffs.[12]

146.    Defendants received Plaintiffs' Reimbursements, including the Outstanding Reimbursements, on behalf of Plaintiffs.

---

attempted to engage in informal discovery and requested information from Defendants that would permit Plaintiffs to perform a tracing exercise, and Defendants refused to provide the requested information

[12] Defendants have exclusive knowledge of the exact amount of Reimbursements, including Outstanding Reimbursements, received on behalf of, but not remitted to, Plaintiffs. Prior to the filing of this Complaint, Plaintiffs attempted to engage in informal discovery and requested information from Defendants that would permit Plaintiffs to perform a tracing exercise, and Defendants refused to provide the requested information.

147.    The Reimbursements, including the Outstanding Reimbursements, constitute Plaintiffs' property.

148.    Defendants ████████████████████████████████████████████ ████████████████████ .

149.    Defendants wrongfully failed to remit to Plaintiffs and fraudulently withheld the Outstanding Reimbursements, thereby benefiting Defendants and harming Plaintiffs by no less than $16,836,022.05.

150.    Defendants have been unjustly enriched by their usurpation of the unremitted Outstanding Reimbursements.

151.    Defendants ceased all communications with Plaintiffs regarding Defendants' failure to remit the Outstanding Reimbursements and have provided no justification for their wrongful actions and/or wrongful inactions.

152.    Thus, upon information and belief, Plaintiffs believe Defendants usurped the outstanding Reimbursements to assist with Defendants' liquidity issues by funding Defendants' ongoing business operations and/or administration of the Defendants' Chapter 11 Cases.

153.    Defendants' unlawful acts have deprived Plaintiffs of the unremitted Outstanding Reimbursements.

154.    Plaintiffs have been impoverished by Defendants' usurpation of the unremitted Outstanding Reimbursements.

155.    Defendants' unjust enrichment and Plaintiffs' unjust impoverishment are directly related to each other.

156.     Defendants have no legal or equitable justification for usurping the unremitted Reimbursements, including the Outstanding Reimbursements, and Defendants have no rightful claim to or interest in the Reimbursements, including the Outstanding Reimbursements.

157.     APA § 10.6 provides that to ████████████████████████████████████ ████████████████████████████████████

158.     Absent equitable relief requested by this Complaint, no other remedy at law exists to return the Outstanding Reimbursements to Plaintiffs other than the imposition of a constructive and/or resulting trust of the Outstanding Reimbursements in an amount no less than $16,836,922.05 to be earmarked and/or segregated for Plaintiffs.

### COUNT V – CONVERSION
### (INJUNCTIVE RELIEF AND/OR OTHER EQUITABLE RELIEF, INCLUDING CONSTRUCTIVE TRUST, RESULTING TRUST)

### [Against All Defendants]

159.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.

160.     Plaintiffs own the exclusive rights to the Books and Records, which constitutes Plaintiffs' property.

161.     Defendants have wrongfully interfered with Plaintiffs' rights to the Books and Records by not transferring such Books and Records and/or providing access to such Books and Records ████████████████████████████████████████████ ████████████████.

162.     Defendants have no rightful claim to or interest in the Books and Records.

163.     Plaintiffs have demanded return of the Books and Records, and Defendants have refused and failed to return the Books and Records to Plaintiffs.

164.     Defendants' continued dominion over the Books and Records is ████████████ ████████████████████████████████████████, which are valuable

96106287v14

and important to Plaintiffs' business and its ability to comply with certain obligations, ██████

████████████████████████████████████████████.

165.     Plaintiffs have been irreparably harmed by Defendants' unlawful conversion of the Books and Records, and Defendants' usurpation has caused and will continue to cause irreparable injury entitling Plaintiffs to injunctive and other equitable relief.

**COUNT VI - FRAUD**
**(INJUNCTIVE RELIEF AND/OR OTHER EQUITABLE RELIEF,**
**INCLUDING CONSTRUCTIVE TRUST, RESULTING TRUST)**

**[Against All Defendants]**

166.     Plaintiffs incorporate all preceding allegations as if set forth fully herein.

167.     Between September 2023 and February 2024, Defendants, through their authorized representatives, including, Mr. Morales and Mr. Rich, represented false material facts as true, including that Defendants would promptly pay the unpaid Reimbursements.

     a.     On September 18, 2023, an authorized representative of Defendants promised that Defendants would process the unpaid Reimbursements shortly.

     b.     On December 3, 2023, an authorized representative of Defendants promised that Defendants would make the outstanding Reimbursements over the following couple of weeks.

168.     Defendants knew that their representations were false or made them with reckless indifference to their truth.

169.     Defendants' false representations promising payment of the Reimbursements were material.

170.     Between September 2023 and February 2024, Defendants did not respond to Plaintiffs' inquiries and omitted and concealed material information regarding, *inter alia*, Defendants' financial status, Defendants' ability to pay, and the status of the Reimbursements.

171.    Mr. Morales and Mr. Rich made their representations and/or omissions as authorized agents for Defendants.

172.    Upon information and belief, Defendants did not intend to perform under the APA and the TSA by, *inter alia*, remitting the Outstanding Reimbursements to Plaintiffs, despite multiple promises to do so.

173.    Upon information and belief, Defendants usurped the Reimbursements for their own purposes, wrongfully diverted and expended Reimbursements, including the Outstanding Reimbursements, and failed to disclose such misuses to Plaintiffs.

174.    Plaintiffs reasonably and justifiably relied on Defendants' representations and/or omissions, by, ████████████████████████████████████████████████████
████████████████████████████████

175.    Plaintiffs have suffered damages by relying on Defendants' misrepresentations and omissions, including monetary damages in an amount no less than $16,836,922.05 of Outstanding Reimbursements, plus attorneys' fees and costs and disruption to Plaintiffs' business.

### COUNT VII – DECLARATORY JUDGMENT
### (PLAINTIFFS' REIMBURSEMENTS, INCLUDING OUTSTANDING REIMBURSEMENTS, ARE NOT PROPERTY OF THE DEBTORS' ESTATES, DEFENDANTS HAVE BEEN UNJUSTLY ENRICHED BY WRONGFULLY EXERCISING DOMINION AND CONTROL TO WITHHOLD AND MISUSE PLAINTIFFS' PROPERTY, INCLUDING OUTSTANDING REIMBURSEMENTS, AND A CONSTRUCTIVE AND/OR RESULTING TRUST SHOULD BE IMPOSED, WITH FUNDS SET ASIDE AND SEGREGATED, IN FAVOR OF PLAINTIFFS)

**[Against All Defendants]**

176.    Plaintiffs incorporate all preceding allegations as if set forth fully herein.

177.    A real, present, and actual controversy of a justiciable nature exists between Plaintiffs and Defendants that is ripe for the Court's resolution regarding their rights and

obligations under the APA, TSA, Letter Agreement and other Transaction Documents, ████

████████████████████████████████████████

178.   Under APA § 7.8, the ███████████████████████████████

████████████████████████████████████████

██████████████████████████████

179.   Under the APA, TSA and Letter Agreement and other Transaction Documents,

Defendants, ███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████ Plaintiffs were entirely dependent

upon Defendants to honor and satisfy their duties and obligations in this regard.

180.   Defendants have no equitable or legal interest in the Reimbursements, including

the Outstanding Reimbursements.

181.   Plaintiffs request a determination and declaration that: (i) Defendants have no

ownership interest in the Reimbursements, including Outstanding Reimbursements;

(ii) Defendants have been unjustly enriched by their wrongful exercise of complete control and

dominion over the Outstanding Reimbursements and wrongful withholding of material

information with respect thereto; (iii) the Reimbursements, including Outstanding

Reimbursements, are the sole and exclusive property of Plaintiffs and are not property of the

Debtors' estates under Section 541 of the Bankruptcy Code; and (iv) Plaintiffs are entitled to

(a) imposition of a constructive and/or resulting trust, with funds to be earmarked and segregated

for Plaintiffs and (b) repayment of the Outstanding Reimbursements, plus attorneys' fees and costs,

before creditors in the Chapter 11 Cases, including secured creditors and administrative expense

claimants, may recover any distributions from the Debtors in their Chapter 11 Cases.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court award the following relief:

a.      An order of specific performance requiring Defendants to comply with all of their obligations under the APA, TSA, Letter Agreement and other Transaction Documents, including but not limited to requiring that Defendants immediately (1) remit to CHIC the wrongfully retained funds totaling no less than $16,836,922.05, which represents all amounts past the ████████████████████████████████████, (2) create and send to Plaintiffs all past-due and future Reconciliation Statements ████████████████████ on a weekly basis, (3) remit all amounts due pursuant to the Reconciliation Statements that are owed to CHIC on a daily basis, ████████████████████, and (4) transfer and/or provide access to, as applicable, all Books and Records to Plaintiffs;

b.      Orders granting temporary, preliminary, and permanent injunctive relief requiring Defendants to (1) immediately comply with all of their obligations under the APA, TSA, Letter Agreement and other Transaction Documents; (2) restraining Defendants from any use, dissipation, and/or commingling of any funds, including healthcare receivables, received on behalf of Plaintiffs ████████████████; (3) immediately open a separate interest-bearing escrow account and immediately deposit therein $16,836,922.05 and not permit withdrawals or other changes to such account be made or transfers to anyone other than Plaintiffs, absent an Order of this Court, after notice to Plaintiffs and opportunity to be heard; (4) continue remitting all Reimbursements to Plaintiffs on a daily basis; and (5) any other or further relief necessary to maintain the status quo and prevent Defendants' continued usurpation of the Reimbursements;

c.       An order creating a constructive trust, express trust, implied trust, resulting trust, and/or equitable lien over all Reimbursements t█████████████████████████████████ and segregation of such funds for the sole benefit of Plaintiffs;

d.       An order requiring an accounting of all Reimbursements received by Defendants, including those that have not been remitted to Plaintiffs;

e.       An order declaring that (i) Defendants have no ownership interest in the Reimbursements, including Outstanding Reimbursements; (ii) Defendants have been unjustly enriched by their wrongful exercise of complete control and dominion over the Outstanding Reimbursements and wrongful withholding of material information with respect thereto; (iii) the Reimbursements, including Outstanding Reimbursements, are the sole and exclusive property of Plaintiffs and are not property of the Debtors' estates under Section 541 of the Bankruptcy Code; and (iv) Plaintiffs are entitled to (a) imposition of a constructive and/or resulting trust, with funds to be earmarked and segregated for Plaintiffs and (b) repayment of the Outstanding Reimbursements, plus attorneys' fees and costs, before creditors in the Chapter 11 Cases, including secured creditors and administrative expense claimants, may recover any distributions from the Debtors in their Chapter 11 Cases;

f.       An order granting pre- and post-judgment interest to the extent permitted in connection with these claims and the Parties' contracts;

g.       An award of reasonable attorneys' fees and all other costs and expenses incurred in this action, █████████████████████████████████████;

h.       An award of punitive damages; and

i.       Such other and further relief as the Court deems just and proper.

January 3, 2025

Respectfully submitted,

**POLSINELLI LLP**

By: *Trinitee G. Green*
Randye B. Soref (*pro hac vice* pending)
(California State Bar No. 99146)
2049 Century Park East, Suite 2900
Los Angeles, California 90067
Telephone: (310) 203-5367
Email: rsoref@polsinelli.com

-and-

Trinitee G. Green (State Bar No. 24081320)
2950 N. Harwood Street, Suite 2100
Dallas, Texas 75201
Telephone: (214) 397-0030
Email: tggreen@polsinelli.com

-and-

Caryn Wang (*pro hac vice* pending)
(Georgia State Bar No. 542093)
1201 West Peachtree Street NW
Suite 1100
Atlanta, GA 30309
Telephone: 404.253.6016
Email: cewang@polsinelli.com

*Counsel for Plaintiffs, Catholic Health Initiatives Colorado, CommonSpirit Health, and CommonSpirit Mountain Region f/k/a Centura Health Corporation*

96106287v14